ORGANON, INC. *v.* UNITED STATES    (No. 5100)\*

United States Court of Customs and Patent Appeals, January 16, 1963

*Eugene R. Pickrell* (*Richard F. Weeks,* of counsel) for appellant.

*Joseph D. Guilfoyle,* Acting Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section (*Daniel I. Auster,* trial attorney, of counsel) for the United States.

[Oral argument November 7, 1962 ; submitted on brief by appellant ; and Mr. Auster]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Associate Judges

MARTIN, Judge, delivered the opinion of the court:

This is an ▮▮ appeal from the judgment of the United States Customs Court, First Division, C.D. 2303, overruling the importer's protest and sustaining the classification of "Heparin Sodium USP XV" for tariff purposes as a medicinal preparation "not specially

---

\*C.A.D. 812.

provided for" under paragraph 5 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739. Appellant contends that the imported merchandise should be classified as a crude drug under paragraph 1669 of the Tariff Act of 1930 and thus admitted free of duty or alternatively as a drug, advanced in condition, under paragraph 34 of said Act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.

Paragraph 5, as modified, reads:

All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for * * *_____ 12½% ad val.

Paragraph 1669 reads:

Drugs such as barks, beans, berries * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

Paragraph 34, as modified, reads:

Drugs, such as barks, beans, berries, * * * and all other drugs of vegetable or animal origin * * *; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol_____ 5% ad val. *Provided*, That the term "drug" wherever used in this Act shall include only those substances *having therapeutic or medicinal properties* [emphasis ours] and chiefly used for medicinal purposes: * * *

The parties in the record stipulated that Heparin [1] delays the clotting of blood; that Heparin is usually obtained from the liver or lungs of domestic mammals used for food by man; that Heparin contains no alcohol; that it is inedible. There was also received in evidence a deposition of a factory chemist, employed by the exporter, who supervised the production of the importation involved, i.e. "Heparin Sodium USP XV." Attached to said deposition is a so-called "Flowsheet" (Exhibit A) showing the production of "Heparin Sodium USP XV" obtained from the original Heparin as contained in certain animal tissues to involve a proteolytic digestion of a coagulated beef lung.

---

[1] There is testimony that the terms "Heparin" and "Heparin Sodium" are synonymous.

Appellant urges that the crude Heparin from which the imported merchandise was processed up to the point of exportation was prepared only to the stage where it had been isolated from such substances as would make it decay or deteriorate during transportation and thus would be a crude drug and classifiable under paragraph 1669. In connection with the alternative claim under paragraph 34 and assuming arguendo that the crude Heparin has been advanced beyond "that essential to the proper packing" etc., it is contended that the imported merchandise is still a drug and dutiable as an advanced drug rather than a medicinal preparation not specially provided for. Appellant urges that a mere isolation process brought about by chemical reaction does not prevent a drug from being classified under paragraph 1669 nor that a mere advance brought about by chemical reaction does not prevent a drug from being classified under paragraph 34.

The Government, on the other hand, contends that the importer has failed to establish that the imported Heparin is not a medicinal preparation as provided for in paragraph 5.

At the trial, Dr. Seymour Z. Lewin, a professor of chemistry at New York University, and a witness for appellant, was asked what Heparin is chemically. He testified:

A. Heparin has been described in previous testimony here as a mucopolysaccharide, or as a sulphated mucopolysaccharide, and the meaning of that polysaccharide term refers to the fact that each of these hexagonal units is a saccharide unit. It is a basic sugar type molecule. The poly comes in from the fact that this is a long polymeric chain. Each of the links is a polymer, and they form the polymeric chain. The chain link that I have indicated here is a purely arbitrary one. All the evidence appears to be that heparin occurs in nature in varying chain lengths. If one called the link a fundamental unit of the chain, there would be "x" of these things, the number "x" having values from 20 to 200 probably. Each of the links in the chain, each of the saccharide links, has various substituents attached to it. The muco in the name, mucopolysaccharide, which describes heparin, comes from the fact there is a nitrogen atom attached in the various places in these saccharide units, and many of these nitrogen groups are sulphated, that is have sulphate groups attached to them. In the tissue from which heparin comes, the end of the chain * * * is attached, it appears from all the scientific evidence, to protein molecules. The protein molecule is itself another complemented polymeric structure, and is represented * * * to indicate something different chemically from the mucopolysaccharide chain itself. * * *

A qualified witness for the Government, Dr. John Day, was asked whether there were any steps in the processing of the merchandise up to the point of exportation that involved chemical changes as opposed to merely physical changes. He answered the question in the affirmative and stated that a proteolytic digestion occurred involving a hydrolysis of peptide linkages (bonds) and that the hydrolysis is

a chemical change.[2] Appellant's expert witness Dr. Lewin agreed that the process employed here caused a chemical change to take place.

The issue presented by this appeal is whether the imported merchandise is a crude drug or alternatively an advancement of the crude drug. If it is not one of these, then it is properly classified under paragraph 5 as a medicinal preparation not specially provided for.

The provision of paragraph 34 relative to therapeutic properties, *supra*, indicates that the determination of the issue involved requires deciding whether Heparin as it is found in the animal tissue possesses *therapeutic properties*. From the case law it is further apparent that we must determine whether the pre-importation treatment causes chemical changes in the material being processed.

On the latter point, the controlling case appears to be *Chemical Specialties Co., Inc.* v. *United States*, 43 CCPA 93, C.A.D. 614. That case involved the question of whether the imported merchandise should be classified under paragraph 5 or paragraph 34 of the Tariff Act of 1930. There the importation of 21-acetoxy pregnenolone was classified by the collector as a medicinal preparation under paragraph 5. The court stated:

> It was stipulated by counsel that the imported 21-acetoxy pregnenolone is produced by a series of chemical steps from a yam commonly known as the "cabeza de negra," and that these steps culminate in the production of 21-hydroxy pregnenolone. It was further stipulated that the 21-hydroxy pregnenolone is acetylated with acetic anhydride thus forming 21-acetoxy pregnenolone. * * *
>
> *     *     *     *     *     *     *
>
> * * * It is to be noted that paragraph 34 * * *, recites "* * * advanced in value or condition by shredding, grinding, chipping, crushing, or any other processes or treatment whatever * * *." However, it appears that this portion of the statute has been judicially construed to include * * * the extraction of a drug with solvents, *Sherka Chemical Co., Inc.* v. *United States*, 33 C.C.P.A. (Customs) 53, C.A.D. 316, and concentration of a drug, *Roche-Organon, Inc.* v. *United States*, 35 C.C.P.A. (Customs) 99, C.A.D. 378. However, we know of no case which has gone so far as to include chemical changes within the meaning of the above-quoted phrase, and we are of the opinion that the chemical change involved in the present case is not included in the meaning of "advanced" * * *.

Cases involving the question of whether a substance should be classified under paragraph 34, * * * rather than paragraph 5, * * * have been before us previously. There is one idea present in these cases, namely, that a basic criterion for an imported substance to be classified under paragraph 34 * * * is that it must have existed as such in the source from which it was obtained regardless of the manner in which it was extracted. See *Roche-Organon, Inc.*

---

[2] There is testimony that proteolytic digestion is an operation in which a protein is ruptured by the addition of water across a peptide bond (a characteristic bond in the protein) thus producing more than one fragment from the original protein.

v. *United States, supra,* and *Sherka Chemical Co., Inc.* v. *United States, supra.* This criterion is not satisfied in the present case.

We are therefore of the opinion that the imported 21-acetoxy pregnenolone is not "natural," "uncompounded," or "advanced" within the meaning of paragraph 34, * * * and therefore does not properly fall under this paragraph. We are also of the opinion that since the imported substance did not exist in the source material from which it was synthesized, it does not properly fall within paragraph 34, * * *.

Both parties agree that the process of hydrolyzing the tissue containing the Heparin involves a chemical change. In fact, there is uncontroverted testimony that the process creates new chemical products. However, the testimony is not as definite as to whether the Heparin, before the proteinaceous matter is split off, possesses the desired therapeutic properties.

Regarding this matter Dr. Lewin testified as follows:

The Witness: Then I have to say a few more words about my understanding of what is the difference between the heparin as it occurs in tissues and the heparin as described in U.S.P., or the heparin produced by the process described in the flowsheet introduced. The heparin structure, this chain like structure that extends, is extended over dozens of these saccharide units. This is the basic chemical structure that confers on heparin its specific properties, its physiological and chemical properties. In the tissues, the evidence appears to be that this chain is tied at the far end to protein. In the process of separating the U.S.P. material from its natural source, what is done is to shear this chain off at that end. It is like shearing the wool off a sheep, or cutting your hair from your head. The chemical structure of the heparin chain is not affected at all by the hydrolysis step, this protein removal step. What is done is to open the bond at the very end of the chain so as to release the heparin, the bulk of which is completely unchanged in chemical properties from its binding to the carcass, and so if the question is, is this a formula for the heparin free of protein, then the answer is, no. I have shown a formula here of heparin as it is tied at one end to the carcass.

Judge Wilson: This is heparin as taken from nature?

The Witness: As it occurs in deposits in the cells where the heparin is stored. When the body uses heparin, the enzymatic processes that occur in the body release this molecule; that is sever the binding to the protein and release the heparin into the blood stream, and then heparin in the blood stream, where it performs its physiological effect, is the heparin free of that protein attachment. The heparin that is described in U.S.P. is the heparin free of the protein attachment.

Chief Judge Oliver: As imported, was the heparin free of the protein?

The Witness: As I understand, the heparin imported is free of that protein.

On cross-examination the witness answered the question "So it has no physiological or therapeutic properties until you split off the proteinaceous matter?" by stating:

A. I don't think the answer to that question is in the affirmative, because if the heparin protein complex, the heparin protein combination were injected into the blood stream, the same enzymatic process that the body uses to release heparin from the deposits would release the heparin from this protein combina-

tion, so that the heparin protein combination would exert the same physiological effect if injected the same way heparin is, through the intermediation of the body's enzymatic process in releasing those molecules.

Thus Dr. Lewin did not expressly state that the Heparin, before being freed from the proteinaceous matter, did not have the therapeutic properties and yet, he would not say unequivocally that it had those properties before being processed.

From reading the testimony as a whole it appears that the *basic chemical structure* which confers on Heparin Sodium USP XV its specific *therapeutic properties* is present in the Heparin when it is tied to a protein, but the *therapeutic properties per se* are *not* present until the Heparin is set free from the protein through a chemical reaction. On the basis of the record before us, it cannot be said that the Heparin as found in the animal tissue before it is freed from the protein is a drug which has "therapeutic or medicinal properties." Also it is clear that the treatment of the original starting material before export does involve a chemical change. Therefore, the merchandise cannot be classified under paragraph 34 or paragraph 1669.

Appellant relies on *Roche-Organon, Inc.* v. *United States*, 35 CCPA 99, C.A.D. 378, to support its position. In determining the question of whether Urine Concentrate in form of R III-crystals was classifiable under paragraph 5 or 34 in that case, the Customs Court had stated in its opinion:

* * * The imported commodity consists of equilin, equilenin, hippulin, possibly some estradiol, coloring matter, and "about 90 per cent oestrone," all of such substances being hormones found naturally in the urine of pregnant mares. The desired product is the estrogenic hormone for its therapeutic properties capable of correcting conditions peculiar to females. * * *

Our court concluded that the merchandise was classifiable under paragraph 34 rather than paragraph 5 by virtue of the principle of relative specificity. In coming to that conclusion, however, it stated "It is not questioned that the imported substance meets squarely every requirement of paragraph 34, including the legislative definition of drug. It is of animal origin; is natural and uncompounded, is not edible, is advanced in condition; has therapeutic or medicinal properties; is chiefly used for medicinal purposes, and contains no alcohol." Since we have found that the merchandise at bar is not a drug within the purview of paragraph 34 obviously the *Roche-Organon* case is not relevant here.

In view of the foregoing it is our opinion that appellant has not discharged its burden of establishing the correctness of classifying the merchandise in a different paragraph than that invoked by the collector. Therefore, the judgment of the Customs Court is *affirmed*.